UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X
LaTOYA ROBINSON, Individually and as Mother and
Natural Guardian of Li. C. (age 14), Leo. C. (age 13) and Lev. C.
(age 10); and JaQUETA CARTER, as Mother and Natural
Guardian of NayS. C. (age 15), NayQ. C. (age 12) and A.C. (age 7),       25 CV 8047 (AKH)

                                Plaintiffs

                                                                         **FIRST AMENDED**
                -against-                                                **COMPLAINT**

**THE CITY OF NEW YORK, NYPD LIEUTENANT**
**RANDOLPH PENA-MEDINA, NYPD  OFFICER**            **JURY TRIAL**
**JEAN K. GILOT, and NYPD OFFICER ROCHEAA**           **DEMANDED**
**WALKER,**
                                Defendants.
------------------------------------------------------------------------------------X

      Plaintiffs, by their attorney, Joel Berger, Esq., for their First Amended Complaint allege, upon

information and belief, as follows:

### NATURE OF ACTION

      1      This is an action to recover money damages arising out of the violation of plaintiffs'

rights under the Constitution and laws of the United States and the State of New York, by employees

of the New York City Police Department (NYPD) on July 19, 2024, including 1) an illegal break-in

and raid upon a private residence -- ***without a warrant***, wielding guns and tasers and threatening use

of force, solely to make an arrest – in violation of *Payton v. New York*, 445 U.S. 573 (1980); and (2)

false arrest of 15-year old boy NayS. C -- the target of the raid -- whose arrest, for a mere class B

misdemeanor, was ***voided*** and who was released without any charges after more than 5 hours in

custody.  There having been no probable cause to file charges against the boy, there would have been

none to obtain a warrant for his arrest had the police sought one in compliance with *Payton*.  The

warrantless raid was captured on video/audio, with the police boasting that they did not need a

warrant because a crime allegedly had been committed and that their forced entry was no different

than rushing into a building on fire.  Present in the dwelling and confronted by the police were plaintiff Robinson -- tenant of the dwelling, who was handcuffed during the raid -- and her three sons ages 14, 13 and 10, and her three nephews ages 15, 13 and 7.  The 15-year-old nephew, NayS. C., is the boy who was arrested and later released without any charges.

### *JURISDICTION AND VENUE*

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, and Fourteenth Amendments to the Constitution of the United States.

3.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

5.      This action is also brough pursuant to the Court's diversity jurisdiction, 28 U.S.C. § 1332 (a) (1), in that Plaintiff JaQueta Carter and her three sons – NayS. C., NayQ. C. and A.C. -- are all citizens of the Commonwealth of Pennsylvania, and all defendants are citizens of the State of New York, and the amount in controversy exceeds $75,000.

### *PENDENT JURISDICTION*

6.      This Court also has jurisdiction over plaintiffs' state law claims, pursuant to its pendent or supplemental jurisdiction as codified in 28 U.S.C. § 1367.

7.      On October 7, 2024, within ninety days after the claims alleged in this complaint arose, a Notice of Claims was duly served upon the Comptroller of the City pursuant to § 50-e of the General Municipal Law.

8.      The Comptroller's office assigned claim numbers 2014PI032783 (LaToya Robinson individually), 2024PI032781 (Li. C.**,** 2014PI032782 (Leo C.), 2024PI032779 (Lev. C.), 2024PI032784 (NayS. C.), 2024PI032785 (NayQ. C. and 2024PI032787 (A.C.).

9. Hearings of all claimants were conducted pursuant to § 50-H of the NYS General Municipal Law on January 6, 17 and 22 and February 14, 2025.

10. Transcripts of the § 50-H hearings were received in February 2025 by the firm that conducted the § 50-H hearings, yet all but one were not delivered to claimants' attorney until April 29 and April 30, 2025, and one additional outstanding transcript, of plaintiff JaQueta Carter's § 50-H hearing conducted on January 17, 2025, was not received until June 4, 2025.

11. On June 25, 2025, a Settlement Demand was sent to the Comptroller's office, accompanied by video/audio and numerous documents about the incident and records reflecting mental health treatment of Ms. Robinson and some of the minors -- including the records of involuntary hospitalization of NayS.C. as a result of a suicide note. Additional mental health treatment records were submitted shortly thereafter.

12. On July 17, 2025, a scheduling official at the Comptroller's office, Francesca Sabbatino, scheduled a settlement conference for September 5, 2025 (later adjourned to September 12, 2025), but she subsequently canceled the settlement conference abruptly and announced that she would no longer schedule any pre-litigation settlement discussion. The only reason given was that plaintiff Robinson had asked her office to perform the routine task of determining whether there were any potential liens due to Ms. Robinson's three boys having been on NYC public assistance.

13. On September 2, 2025, Ms. Sabbatino's supervisor, Deputy Director of Litigation Rohit K. Mallick, Esq., overruled Ms. Sabbatino and advised plaintiffs that his office would proceed to re-schedule a settlement conference.

14. However, the Comptroller's office never re-scheduled the settlement conference.

15. More than thirty days have elapsed since the service of the Notice of Claims, and

adjustment or payment of the claims has been neglected or refused by defendant City of New York.

16.    Plaintiffs are commencing this action within a year and 90 days of the July 19, 2024, date on which the events of this action occurred, as required by General Municipal Law § 50-i (1) (c).

## JURY DEMAND

17.    Plaintiffs demand trial by jury in this action.

## PARTIES

18.    Plaintiffs are Black Americans and citizens of the United States.  Plaintiff Robinson and her three sons are residents of the State of New York and City of New York (Bronx County). Plaintiff Carter and her three sons are residents of Allentown, Pennsylvania.

19.    Defendant City of New York operates the NYPD, a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers and supervisory police officers.

20.     At all times relevant herein, defendants Lt. Pena-Medina, Police Officer Gilot (Shield 12090) and Police Officer Walker (Shield 5475) were NYPD police officers who broke into and raided Ms. Robinson's dwelling without a warrant and arrested 15-year-old NayS C.

21.    At all times relevant herein, defendants Lt. Pena-Medina, Officer Gilot and Officer Walker were all assigned to the 47th  Precinct, 4111 Laconia Avenue, Bronx, New York, 10466. Shortly after this lawsuit was filed Pena-Medina was transferred to the Internal Affairs Bureau.

22.    At all times relevant herein, defendants Pena-Medina, Gilot, Walker, were acting as agents, servants and employees of defendant City of New York and the NYPD.

23.    At all times relevant herein, all defendants were all acting under color of state law.

*FACTS*

**A.    THE INCIDENT**

24.     On Friday, July 19, 2024, at approximately 8:20 P.M., at plaintiff Robinson's home, 837 Chestnut Street, Bronx, NY 10467, three NYPD officers of the 47th Precinct -- Lieutenant Pena-Medina, PO Gilot and PO Walker, broke through the locked front door and secondary door of the dwelling and raided it.

25.     PO Walker had his firearm drawn and pointed at Ms. Robinson.  PO Gilot was wielding a taser.

26.    ***The officers did not have a search warrant***

27.    ***The officers did not have a  warrant to arrest any individual.***

28.    ***The arrest that the officers made, initially charged as a class B misdemeanor, was subsequently marked "VOIDED."***

29.    ***The individual arrested, 15-year-old NayS.C., was released without any charges after more than 5 hours of confinement at the 47th Precinct.***

30.     Defendant Lieutenant Pena-Medina admitted on video/audio captured by Ms. Robinson and on his own body cam that he had authorized the break-in without Ms. Robinson's permission, at first claiming that he could just break in to the home as if there was a fire and investigate property damage as if there was a fire.

31.     However, Pena-Medina and the other defendant officers also announced to Ms. Robinson that they were looking for her 15- year-old nephew, NayS. C.

32.    Lt. Pena-Medina explicitly threatened that force would be used if NayS. C. did not

come downstairs from the 2-story dwelling. Robinson Video IMG 2501, July 19, 2024, 8:22 P.M., at 0:37.

33.    Ms. Robinson protested that there obviously was no fire and that the forced warrantless entry was illegal

34.    Pena-Medina responded on the video/audio "no it's not" and explicitly stated "this is a crime, Ma'am, worse." Video IMG 2501, July 19, 2024, at 0:46 –1:10.

35.    Later on video IMG 2501, at 5:43, 5:58 and 6:19, defendant Gilot repeats this statement -- three times -- attempting to justify the warrantless break-in by stating:  "It's about a crime."

36.    The police handcuffed the protesting  Ms. Robinson

37.    Ms. Robinson remained handcuffed for several minutes .

38.    Ms. Robinson's three sons and three nephews were all upstairs in the 2-story dwelling at the time.

39.    The police demanded that 15-year-old NayS. C. come downstairs.

40.    The police alleged that NayS. C. had been involved in an altercation with an individual outside a bodega near the house and that he had allegedly threatened that individual with a knife.

41    The police admitted that the individual whom NayS. C. had allegedly threatened, an adult named Enrique Foote, had already been arrested and was in custody at the 47th Precinct.

42.    Foote had twice been convicted for felonious assaults and had served time in New York State prisons for both felonies.

43.    Due to the fact that Foote had already been arrested and was in detention at the

47th Precinct,  Foote was not in any exigent danger at the time that the officers broke into Ms. Robinson's dwelling without any warrant.

44.     No individual within Ms. Robinson's dwelling at the time of the officers' warrantless break-in was in any exigent danger.

45.     The above-referenced statements of the officers who broke into Ms. Robinson's dwelling without a warrant, as well as footage depicting the damage to Ms. Robinson's doors, are all captured on Ms. Robinson's video/audio and on the officers' body cams.

46.     Foote was a complete stranger to Ms. Robinson and the six boys.

47.     At no time had Foote ever been inside of Ms. Robinson's dwelling – not before, during, or after the incident of this lawsuit.

48.     After the police had begun breaking through yet a third locked door, a door leading to the upstairs level of the home, Ms. Robinson asked all of her sons and nephews to come downstairs.

49     PO Walker kept his firearm drawn and his PO Gilot kept wielding his taser as the six boys came downstairs.

50.     Lt. Pena-Medina several times ordered the two officers to put away the firearm and taser, but they ignored their supervisor's directive.

51.     The police then handcuffed and arrested 15-year-old NayS. C.

52 .     They did not even allow NayS. C. to put on shoes, and took him in his socks to the 47th Precinct.

53.     Ms. Robinson had asked if NayS, C. could put on his sneakers first, and was told only that she could bring the sneakers to the precinct.

54.    Upon her arrival at the 47th Precinct Ms. Robinson was not permitted to provide the sneakers and was not even allowed to enter the precinct to see NayS. C.

55.    More than 5 hours after NayS. C.'s arrest the police marked his arrest "*VOIDED*" and he was released without any charges.

56.    During those 5+ hours NayS. C. was handcuffed to a bench in a small room,

57.    Ms. Robinson and the six boys were terrified at the warrantless raid on the sanctity and privacy of Ms. Robinson's home.

58.    Ms. Robinson and the six boys were all confined to the premises during the raid.

**B.    EVENTS PRECEDING THE WARRANTLESS BREAK-IN**

59.    Ms. Robinson had called 911 approximately an hour before the break-in because she had heard some of her sons and nephews screaming from across the street outside her home, about an incident that had occurred at a convenience store approximately one block from her home.

60.    Ms. Robinson went into the street to investigate and learned that an adult male had assaulted her 15-year-old nephew NayS. C. outside the convenience store and had smashed a phone belonging to her 10-year-old son Lev. C.

61.    Ms. Robinson observed that NayS. C. had big red spots on the back of his neck, and she made a 911 call from the street.

62 .    Ms. Robinson's three sons and her two youngest nephews were scared and all ran into the house.

63.    Ms. Robinson and NayS. C. remained on the street waiting for the police to arrive.

64.    Ms. Robinson and NayS. C. spoke with the officers who responded to the 911 call,

65.    Ms. Robinson and NayS. C. then went into Ms. Robinson's home.

8

66.     The police allowed NayS. C. and Ms. Robinson to depart the scene.

67.     The police did not detain or arrest NayS. C. at that time.

68.     Approximately 30-45 minutes later defendant Lt. Pena-Medina arrived,

69.     Pena-Medina had been called to the scene by one or more of the officers who had spoken with Ms. Robinson and NayS. C.

70.     At that time defendant Pena-Medina authorized and supervised the warrantless break-in into Ms. Robinson's home, accompanied by defendants P.O. Gilot and P.O. Walker.

71.     Three other officers, POs Britney Beckford, Al Rivera and Steve Mayorga, also entered Ms. Robinson's dwelling, having also been authorized to do so by Lt. Pena-Medina..

72.     PO Gilot alleged  that  NayS. C. had been seen possessing a knife and with it threatening Foote, the man who had assaulted him, and that there was video evidence to that effect.

73.     The officers did not find any such knife on NayS. C.'s person or elsewhere in the home.

74.     At no time was NayS. C. in possession of a knife

75.     At no time did NayS. C. threaten anyone with a knife.

76.     The officers nonetheless arrested NayS. C. and took him in handcuffs to the 47th Precinct.

77.     Footage of the assault on NayS. C. (also on the video described above), taken from a nearby store, does not depict NayS. C. with a knife or any other weapon.

78.     Defendants have not to date provided any video evidence that NayS. C. had been in possession of a knife or had threatened anyone with a knife.

79.     The police subsequently determined during the period of NayS. C.'s confinement at the 47th Precinct that there had been no lawful basis for arresting NayS. C.

80.     NayS. C.'s arrest was marked "***VOIDED***" and he was released without any charges.

9

81.   NayS. C. was not allowed to see his mother, Ms. Carter, or his aunt, Ms. Robinson, during his more than 5 hours of confinement at the 47th Precinct.

81.   Both Ms. Robinson and later Ms. Carter came to the Precinct but were not allowed to enter or to provide NayS. C.'s sneakers

82..   The police determined that  NayS. C. had been assaulted and injured on the street by Enrique Foote, a 25-year-old adult Caucasian male who had already been arrested and was confined at the 47th Precinct at the time of the forced entry into Ms. Robinson's dwelling.

83.   Foote had a criminal record of two prior felony assault convictions, in 2018 and 2022, each of which had resulted in his incarceration in NYS prisons.

84.   It is undisputed that at no time before, during or after the incident was Enrique Foote ever inside Ms. Robinson's home.

85.   Even if Foote had in fact been the victim of an assault on the street by NayS. C., he was not even arguably in any danger from within the dwelling,

86.   At the time of the break-in no individual was even arguably in any danger from within the dwelling.

87.   There being no one in the house in any danger, the police lacked exigent circumstances justifying the warrantless break-in and raid on Ms. Robinson's house.

88.   According to a Complaint Report based upon information provided by defendant PO Gilot, Foote had lied to the police and had falsely accused NayS. C. of threatening him with a knife.

89.   Even making the dubious assumption *arguendo* that it was reasonable for the police to accept the word of this twice-convicted adult violent felon whom they had already arrested, the

10

only lawful procedure under *Payton v. New York*, 445 U.S. 573 (1980) would have been to attempt to obtain a warrant for NayS. C.'s arrest -- not to conduct a warrantless break-in into Ms. Robinson's home and threaten to use force to arrest the 15-year-old NayS. C.

90.    Defendant Lt. Pena-Medina is recorded on his own body cam stating that the reason for the break-in was to make an arrest: "A perp is behind closed doors, we can't just go away…we have to address the condition" (body cam at 18:22-30). "It's either I break the door or we call SWAT and they break the door, the door was going to be broken" (body cam at 18:07-12). We have to arrest both because they both complained against each other" (body cam at 22:10).

90.    Both Gilot and Pena-Medina are also recorded on Pena-Medina's body cam admitting that Foote was already under arrest and detained at the 47th Precinct at the time of the break-in (body cam at 14:50, 16:00, 17:33), but said that they had to arrest NayS. C. also because, in Pena-Medina's words, "It's cross-complaints, we have to treat them equally" (body cam at 16:04-06).

91.    The Arrest Report ultimately marked ***VOIDED*** merely accused NayS. C. of the Class B misdemeanor of menacing in the 3rd degree (Penal Law §120.15), rather the Class A misdemeanor of menacing with a "dangerous instrument" (Penal Law §120.14, menacing in the 2nd degree).

## *C.  THE LAW*

92.     Warrantless entries into the home are " ' presumptively unreasonable,' " because  " ' physical entry of the home is  the chief  evil against which the wording of the Fourth Amendment is  directed,' "*United States v. Allen*, 813 F.3d 76, 81 (2d Cir. 2016), quoting *Payton v. New York*, 445 U.S. 573, 586 (1980). " ' To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when

… probable cause is clearly present.' " *Allen* at 81, quoting *Payton* at 588-89. (It was undisputed in *Payton* that probable had existed to arrest Payton for murder.) "[T]he Fourth Amendment applies with its greatest force in the home." *Allen* at 85.

93.    The standard for a warrantless forced entry to make an arrest to be constitutionally valid due to "exigent circumstances" is also well-settled: "…a forced entry in response to exigent circumstances requires finding a probability that a person is in 'danger.' " *Kerman v. City of New York*, 261 F. 3d 229, 236 (2d Cir. 2001), quoting *Tierney v. Davidson*, 133 F. 3d 189, 196-97 (2d Cir. 1988). This strict rule applies because "[t]he home has properly been regarded as among the most highly protected zones of privacy, and the sanctity of private dwellings [is] ordinarily afforded the most stringent Fourth Amendment protection." *Kerman* at 236, quoting *Ayeni v. Mottola*, 35 F. 3d 680, 685 (2d Cir. 1994) (citations omitted).

94.    Neither Enrique Foote nor anyone else was even arguably in "danger" when the police broke into Ms. Robinson's dwelling without a warrant in order to arrest NayS. C.

95.    Police efforts to circumvent the requirement of exigent circumstances by alternatively claiming the need for "hot pursuit" of a suspect have been uniformly rejected.

96. Only four years after *Payton* the Supreme Court held that "hot pursuit" requires ***both*** "immediate or continuous pursuit…from the scene of a crime" ***and*** a "threat to public safety." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984).

97. In this case there was no "immediate or continuous pursuit."

98.    NayS, C. and Ms. Robinson remained at the scene on the street to speak with officers who responded to Ms. Robinson's 911 call,

99. NayS. C. and Ms. Robinson, after speaking with the officers who had responded to Ms.

Robinson's 911 call, were permitted by the officers to return to Ms. Robinson's dwelling.

100.  NayS. C. was not arrested on the street by the officers who had responded to Ms. Robinson's 911 call **[Admitted by defendants Pena-Medina and Gilot, Answer of January 29, 2026, ¶ 49.]**

101.  It was only later, after Lt. Pena-Medina arrived at the scene and authorized the break-in, that he and the other defendant officers forcibly entered the dwelling without a warrant, wielding firearms and a taser, stating that they were seeking to arrest NayS. C. by force if necessary. **[Absence of a warrant admitted by defendants Pena-Medina and Gilot, Answer of January 29, 2026, ¶ 25.]**

102.  At the time of the break-in there was no threat to the safety of Enrique Foote or to the "public safety" of anybody else.

103.   The raid was a gross violation of the Fourth Amendment rights of Ms. Robinson, her three sons and her three nephews.

104.   The applicable Fourth Amendment principles had been settled, clearly-established law for more than four decades since the 1980 *Payton* decision and its successors.

105.   All police officers -- let alone a high-ranking supervisor such as a Lieutenant -- must comply with those principles.

106.  Lt. Pena-Medina and the other defendants shamelessly violated those principles and even boasted on video that they had the right to do so -- to forcibly enter a home without a warrant solely to arrest NayS. C. on a cross complaint of menacing -- a misdemeanor -- advanced by Enrique Foote.

### D.  THE AFTERMATH

107.    Enrique Foote, whom the police admitted to Ms. Robinson had already been arrested prior to the police breaking into Ms. Robinson's house, was charged with Assault in the Third Degree (PL § 120.00.01, a class A misdemeanor) and Harassment (PL §240.26.01, a Violation), for his criminal conduct toward the 15-year-old NayS. C.

108.   Fifteen-year-old NayS.C. was eventually released without any charges from the 47th Precinct at approximately 2 A.M. on July 20, 2024.

109.  NayS. C. ultimately was not charged with any offense, photographed, or fingerprinted.

110. The Arrest Report for NayS C.'s arrest, listing PO Rodney Vandunk (Shield 3927) as the Arresting Officer, explicitly states at the very top "***RECORD STATUS: VOIDED***."

111..    NayS. C.'s mother, Plaintiff JaQueta Carter, drove 2½ hours from her home in Allentown, Pennsylvania to the 47th Precinct in the Bronx,

112.    Upon her arrival Ms. Carter was kept outside of the Precinct.

113.    At no time was Ms. Carter allowed into the Precinct to see her son.

114.    Ms. Carter was in possession of NayS. C.'s sneakers and asked the police at the Precinct to bring the shoes to him, but that request was denied.

115    Ms. Carter was told that NayS C. was being held until some kind of paperwork was concluded.

116.    To date no such paperwork providing reasons why the arrest was voided has been provided to plaintiffs.

117.    Ms. Carter was still waiting on the street at approximately 2:00 A.M. on July 20, 2024, when NayS. C. was finally released upon the notation that his arrest had been marked "***VOIDED***."

118.  At Enrique Foote's arraignment Foote was served with an Order of Protection requiring him to stay away from NayS. C. and have no contact of any kind with NayS. C.

119.  No Order of Protection was entered against NayS. C.,

120.  NayS. C.was not charged with any offense, was not even given a Desk Appearance Ticket or a Summons, and did not have to appear in any court.

121.  The disposition of the charges against Foote is unknown. They were still pending as of the date of the Notice of Claim. *People v. Enrique Foote*, Docket No. CR-018197-24BX (Criminal Court, Bronx County). Following his arraignment Foote had two court appearances (Aug. 23, 2024, and Sept. 26, 2024), both resulting in adjournments. He was scheduled to appear in court again on Oct. 24, 2024, but *Web Criminal* provides no record of any subsequent proceedings.

122.  Despite Foote's criminal record, he may have been allowed some kind of plea bargain under which the record was sealed.

123.  *Web Criminal* records do reflect the charges against Foote for assaulting NayS. C.

124. Records of the NYS Department of Correctional and Community Services do document Foote's two prior felony convictions and incarcerations in state prison for assaultive crimes.

125.  The day after the police break-in Ms. Robinson received a call from PO Rodney Vandunk of the 47th Precinct,

126.  PO Vandunk is listed as the officer who prepared the Complaint Report against NayS. C., based  upon information from PO Gilot which set forth allegations made to PO Gilot by Enrique Foote.

127.  PO Vandunk is also the officer listed as the Arresting Officer on the voided Arrest Report that had charged NayS. C. with the Class B misdemeanor of menacing in the 3rd degree.

128.   PO Vandunk was not at the scene of the investigation or the arrest, and defendants' discovery to date does not provide any explanation as to why the complaint and the arrest were assigned to him.

129.   During the telephone call PO Vandunk apologized to Ms. Robinson.

130.   PO Vandunk admitted to Ms. Robinson that there was no video evidence depicting NayS. C. in possession of any knife or threatening Foote or anyone else with a knife.

131.   PO Vandunk also gave Ms. Robinson the number of what he described as a Report on the incident, which she recorded as 2024-047-008281, but when Ms. Robinson contacted the 47th Precinct she was advised that the report would not be released to her or her attorney.

132.   The Complaint Report provided by defendants in discovery is numbered 2024-047-008280 and reflects only Foote's allegation to PO Gilot that NayS. C. had threatened Foote with a knife after Foote admittedly pushed NayS. C. off of the boy's bicycle and broke the cell phone.

133.   The Arrest Report marked "*VOIDED*," provided by defendants in discovery (Arrest ID B24633309-N), repeats Foote's allegation but contains no statement as to why the arrest of NayS. C. was voided.

134.   Defendants have not to date provided in discovery any Report explaining the reasons why the arrest was marked "*VOIDED*" and why NayS. C. was released without any charges.

135.   In light of the voiding of the arrest and the release of NayS. C. without any charges, the police did not have probable cause to obtain a warrant for NayS. C.'s arrest had they obeyed the requirement of *Payton v. New York* and sought a warrant instead of conducting a warrantless break-in to arrest him.

136.   Ms. Robinson initially called the NYC Civilian Complaint Review Board (CCRB) the

day after the incident but subsequently withdrew her CCRB complaint lest it delay or interfere with other proceedings, and the CCRB has marked the matter as "Closed." CCRB Case # 202407327.

### *DAMAGES*

137.    The warrantless raid has left Ms. Robinson, her three sons and her three nephews shattered and frightened.

138.     Ms. Robinson and her three sons and her three nephews are fearful that if the police could do this sort of thing to them once, it could easily happen again.

139.    Ms. Robinson and her three sons and her three nephews have flashbacks and nightmares about the incident

140.    Ms. Robinson and her three sons and her three nephews are scared that they have no defense against this kind of police intrusion into the sanctity of a dwelling.

141.    The six boys were especially traumatized by experiencing such an encounter with the police at such an early age, an encounter that included being confronted by police officers who were wielding guns and tasers and threatening the use of force.

142.    Ms. Robinson and her three boys all have been seen by mental health professionals and diagnosed with PTSD.

143.    Fifteen-year-old NayS. C. was especially traumatized by the police raid, by being handcuffed and arrested during the raid, and by being confined to the 47th precinct handcuffed to a bench in a small room for more than 5 hours without being allowed to see his mother or his aunt.

144.    A few months after his arrest NayS, C. was involuntarily hospitalized at the Lehigh Valley Hospital in Pennsylvania for 36 hours because he wrote a note threatening suicide after

being called to his school principal's office over a minor incident in which one of his friends was

at fault.

145.  NayS. C.'s mother, Plaintiff JaQueta Carter, explicitly testified at her § 50-H hearing that

the suicide note resulted from NayS. C.'s fear of "going to go to jail," Transcript of Jan. 17, 2025,

p. 26 line 15, "of being arrested and going to jail again." Transcript of Jan. 17, 2025, p. 28, lines

10-13.

146. Plaintiffs are also entitled to punitive damages, since the police officers ignored clearly

established constitutional principles that had been in place for more than four decades, defendant

Lieutenant Pena-Medina claiming -- on video/audio -- that the forced entry was no different than

rushing into a building on fire, and then arguing that the raid was worse than a fire because a crime

allegedly had been committed.

147.  The 15-year-old NayS. C. is also entitled to punitive damages because his arrest was

baseless, the police having marked the arrest "*VOIDED*" and having released him after more than

5 hours in custody, handcuffed to a bench, without any charges at all -- without even being

allowed to see his mother or his aunt, without even being allowed to put on shoes.

148.  Defendant City of New York has a long-standing and well-documented policy of

indemnifying officers it represents for all awards of punitive damages.

### *FIRST CLAIM FOR RELIEF*

149.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-148.

150.    Defendants, by their conduct toward plaintiffs alleged herein, violated plaintiffs'

rights guaranteed by 42 U.S.C. § 1983, the Fourth, and Fourteenth Amendments to the

Constitution of the United States, Article I, §§ 1, 6, 11 and 12 of the Constitution of the State of

New York, and the laws of the State of New York and the City of New York.

### SECOND CLAIM FOR RELIEF

151.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-148 and 150.

152.    The conduct toward plaintiffs alleged herein constituted an illegal forced break-in of a dwelling, false arrest, unnecessary and excessive use of force, and employee negligence.

153.    The conduct toward plaintiffs alleged herein subjected them to trauma, shock, debasement, fright, fear, humiliation, embarrassment, loss of freedom, harassment, and physical, psychological and emotional injury, trauma, pain, and suffering.

### THIRD CLAIM FOR RELIEF

154.    Plaintiffs repeat and realleges the allegations contained in ¶¶ 1-148, 150, and 152-153.

155.    At all times relevant herein, the individual defendants were on duty and were acting within the scope of their employment as agents, servants and employees of the City of New York, which is therefore responsible for their conduct under common law, state law, city law and Article I, §§ 1, 6, 11 and 12 of the Constitution of the State of New York.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests judgment against defendants as follows:

(a)    Compensatory damages against all defendants, jointly and severally;

(b)    Punitive damages against all individual defendants, jointly and severally;

(c)    Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(d)    Such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          February 16, 2026

19

Respectfully submitted,


/s/ Joel Berger
**JOEL BERGER**
122 East 42nd Street
Suite 3300
New York, NY 10168
(212) 687-1425
joelberger1955@yahoo.com

**ATTORNEY FOR PLAINTIFFS**

**TO:** Hon. Steven Banks, Corporation Counsel
Att: Yini Zhang, Esq., Senior Counsel
NYC Law Department
Special Federal Litigation Division
100 Church Street, Room 3-178
New York, NY 10007
(212) 356-3541
yinzhan@law.nyc.gov

**ATTORNEY FOR DEFENDANTS**

## DECLARATION OF SERVICE

    **JOEL BERGER** declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, upon information and belief, that the following is true and correct:

    1.  I am the attorney for plaintiffs in the above-captioned action.  I was admitted to practice before the United States District Court for the Southern District of New York on April 23, 1970, and before the courts of the State of New York on December 23, 1968.

    2.  On February 16, 2026, I served Plaintiffs' First Amended Complaint upon Hon. Steven Banks, Corporation Counsel, NYC Law Department, Att: Yini Zhang, Esq., Senior Counsel, via email at ServiceECF@law.nyc.gov. pursuant to the Department's announcement of June 23, 2020. On the same date I also provided Ms. Zhang with a courtesy copy via email at yinzhan@law.nyc.gov.

/s/ Joel Berger
**JOEL BERGER**

20